**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

───────────

**No. 14-4451**

───────────

UNITED STATES OF AMERICA,

        Plaintiff - Appellee,

v.

ALI AL-TIMIMI,

        Defendant - Appellant.

───────────

Appeal from the United States District Court for the Eastern District of Virginia, at Alexandria.  Leonie M. Brinkema, District Judge.  (1:04-cr-00385-LMB-1)

───────────

Argued:  October 24, 2025                 Decided:  January 9, 2026

───────────

Before WYNN, THACKER, and HARRIS, Circuit Judges.

───────────

Vacated and remanded by published opinion.  Judge Wynn wrote the opinion, in which Judge Thacker and Judge Harris joined.

───────────

**ARGUED:** Geremy C. Kamens, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Alexandria, Virginia, for Appellant.  Gordon D. Kromberg, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia, for Appellee.  **ON BRIEF:** Erik S. Siebert, United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia, for Appellee.

WYNN, Circuit Judge:

The First Amendment does not permit the Government to imprison a person for speech unless that speech falls within a narrow and well-defined category of unprotected expressions—such as incitement of imminent lawless action or speech that intentionally solicits or facilitates a specific crime.

Ali Al-Timimi was convicted based entirely on words he spoke in the immediate aftermath of the September 11, 2001 attacks—words that were inflammatory, disturbing, and deeply offensive, but that urged no concrete criminal plan and did not provide operational assistance for the commission of any particular offense. For two decades, Al-Timimi has been imprisoned or confined to his home while his criminal case has made its way through appeals, remands, motions, and delays.

Because the Constitution forbids criminal punishment for protected advocacy—however odious the content of that advocacy—we conclude that Al-Timimi's speech remained protected under the First Amendment.[1] Accordingly, we must vacate Al-Timimi's convictions and remand to the district court for entry of judgments of acquittal.

---

[1] The First Amendment cautions us to tread carefully where expressive freedoms are implicated. But the Constitution neither promises nor provides easy answers. Judges must therefore draw lines—imperfect ones, assuredly, but lines nonetheless. And when those lines provoke disagreement over where advocacy ends and conspiracy begins, that disagreement is not a failure of the First Amendment but a testament to its validity—particularly where speech is delivered under conditions that make its consequences immediate and undeniable.

I.

A.

1. *Events Prior to 9/11 Attacks*

Well before September 11, 2001, Ali Al-Timimi helped found an Islamic Center called "Dar al-Arqam" in Falls Church, Virginia, and served as a lecturer there. Though not a cleric, Al-Timimi was viewed as a respected elder and a person knowledgeable about Islam, and adherents of Islam looking to learn more about their faith would attend his lectures. Numerous young Muslim men came to know Al-Timimi, and each other, through Dar al-Arqam.

Beginning at least as early as 2000, a group of these men began making preparations to engage in jihad in the form of combat.[2] Indeed, some of the men formed a group to begin playing paintball together for the purpose of engaging in "personal jihad training."[3] J.A. 193.[4]

Two individuals—Nabil Gharbieh and Yong Kwon—started the group, and they invited others to join, including Donald Idris Surratt, Caliph Basha Ibn Abdur-Raheem, and Hammad Abdur-Raheem. Others eventually joined as well, including Randall Royer (also called Ismail Royer), Mahmood Hasan, Mohammed Aatique, Seifullah Chapman, and

---

[2] The term "jihad" can refer broadly to "a holy war waged on behalf of Islam as a religious duty," as well as "a personal struggle in devotion to Islam especially involving spiritual discipline." *Jihad*, Merriam-Webster Online, https://www.merriam-webster.com/dictionary/jihad [https://perma.cc/D4WQ-V9JL] (last visited Jan. 7, 2026).

[3] In the context of the paintball group, those involved were specifically preparing for jihad in the form of "combat." J.A. 193.

[4] Citations to the "J.A." refer to the Joint Appendix filed by the parties in this appeal.

3

others. Al-Timimi did not participate in the paintball group, but Gharbieh and Kwon told him about it to gauge whether he approved. Al-Timimi didn't endorse or reject the idea.

After the paintball group had been meeting for some time, Chapman informed the others that the FBI had approached him about it. Gharbieh, Kwon, and Chapman sought Al-Timimi's guidance about the FBI inquiry. Al-Timimi chastised them for making their training efforts too obvious by meeting in a large group, wearing camouflage, and traveling to the paintball site together with their paintball guns. He advised them that they should not cease meeting altogether, because that could raise suspicion, but rather that they should be more discreet in gathering to play paintball or play soccer instead. The men took Al-Timimi's advice and continued playing paintball but began gathering less conspicuously.

Multiple members of the group—including Gharbieh, Kwon, Chapman, Hammad, Royer, and Ibrahim Al-Hamdi—also bought real firearms, specifically AK-47s or similar weapons, to familiarize themselves with the weapons they were likely to use if they were ever able to further their training by attending a jihad training camp overseas. And some of these individuals made plans to travel overseas to get combat training in Pakistan from a group called Lashkar-e-Taiba (LET).

LET's philosophy was grounded in Salafi Islamic beliefs, and the group had a presence throughout Pakistan, running schools, libraries, and hospitals, but also sustaining a militant wing that was particularly active in Kashmir. Aatique, for instance, made plans in late summer 2001 to travel to Pakistan to visit family, and he had loose plans to attend an LET training camp while he was there. He did not tell Al-Timimi about these plans when he made them.

4

Some from the paintball group had already been overseas and received combat training. Al-Hamdi had trained with LET in Pakistan in roughly September 2000, intending to go on to fight in Kashmir. Royer had also trained at an LET camp in Pakistan in 2000 and had fought in Bosnia.

## 2. *Immediate Aftermath of 9/11 Attacks*

On the evening of September 11, 2001, after the attacks, Al-Timimi and others gathered at Dar al-Arqam. Al-Timimi told those gathered to be cautious after the attacks, anticipating possible animosity towards Muslims in the United States. Later that night, he told Kwon to "gather some brothers and come up with a . . . contingency plan" to prepare for the possibility of "mass hostility towards Muslims in America." J.A. 640. Accordingly, Kwon invited Gharbieh, Royer, Al-Hamdi, Surratt, Hasan, Caliph Basha Ibn Abdur-Raheem, Hammad Abdur-Raheem, and Masaud Khan to his home that weekend.

The gathering at Kwon's home took place on the evening of September 16, 2001. Many of the individuals Kwon had invited were in attendance, including Royer, Hammad Abdur-Raheem, Caliph Basha Ibn Abdur-Raheem, Hasan, and Khan; Aatique also attended. Although the group was assembled upon Al-Timimi's advice to Kwon, Al-Timimi himself wasn't initially invited; however, Kwon spoke to Al-Timimi earlier on the day of the gathering and mentioned it to him, and Al-Timimi asked if he could attend. So after the other attendees had gathered, Kwon picked up Al-Timimi and brought him back to Kwon's home.

Once the two arrived, Al-Timimi instructed Kwon "to unplug the message machine and turn off the phones." J.A. 652. He told those gathered that they "should not repeat anything that was said in the meeting" to anyone not gathered there. J.A. 654.

Al-Timimi addressed the group. At Al-Timimi's trial, Kwon recounted Al-Timimi's words that evening: "[H]e told us that we need to do three things. First, he said we need to repent; second, we need to leave the United States; and third, he said, 'Join the mujahideen.'" J.A. 1147. Kwon recalled Al-Timimi instructing, "it doesn't matter if we fight the Indians or the Russians or the Americans, that this is all legitimate jihad." J.A. 1148. Al-Timimi said that it was "obligatory on all Muslims to go and defend Afghanistan." *Id.* If the men stayed in the United States rather than leaving the country, and therefore continued paying taxes to the United States, Al-Timimi explained, "part of that tax money will go . . . for U.S. military, which is fighting the Muslims, so you'll be partly responsible for that." J.A. 1149.

At some point, Gharbieh arrived to Kwon's home with another man who was unknown to others in attendance. When they walked in, Al-Timimi "changed his subject all of a sudden" and "started talking about how we should . . . stay at home and be careful" because of "post-9/11 events." *Id.* Royer pulled Gharbieh to the side and spoke to him, after which Gharbieh and the other individual left. After they left, Al-Timimi "resumed the original topic." *Id.*

Al-Timimi specifically encouraged the men gathered to go to Pakistan to "join the LET and get some training from the LET camps." J.A. 1153. He said the LET was "on the sunnah," the "correct path" of Islam. *Id.* Al-Timimi told Kwon that, since Kwon was

Korean, he could "at least . . . leave the United States and go to Korea." J.A. 1154. Kwon asked, "what about if I can go to Pakistan with Mahmood [Hasan]?" and Al-Timimi responded that that would be even better. *Id.* Al-Timimi advised the group to "go through Royer," who could facilitate connection with LET, to get to the camps. J.A. 1155.

Al-Timimi eventually went home. Afterwards, attendees at Kwon's home were "excited" and "fired up." J.A. 1159. They discussed concrete plans to travel to Pakistan to train with LET. Several of the men planned to travel to Pakistan to train with LET, after which they would continue to Afghanistan to fight in support of the Taliban if necessary.

Al-Timimi's talk was "a big factor" in Kwon's decision to make the trip to Pakistan to get training with LET. J.A. 1159. Just two days before the gathering at his home, Kwon had paid rent on his Virginia apartment, because he "didn't have any plans to travel" yet. J.A. 1181. But right after the gathering at his home, Kwon ordered coats appropriate for the climate at the LET camps.[5] Hasan similarly said that Al-Timimi "inspired" him, though Al-Timimi "didn't make [Hasan] do anything." J.A. 2255. They decided to travel to Pakistan as soon as they could get visas. The next day, Kwon and Hasan went to the embassy and applied for visas.

Al-Timimi's words had a similar "impact" on Aatique, who already had plans to travel to Pakistan but had become "shaky" after 9/11 on his commitment to go to an LET

---

[5] Khan had brought a page from a catalog showing a winter coat with him to Kwon's, which he produced when the discussion turned to preparations for traveling to the LET camps, suggesting that Khan had already at least contemplated making the trip before the gathering at Kwon's home. Kwon ordered the coat Khan had selected.

camp; after the talk at Kwon's home, though, he decided to "go through what [he] had planned." J.A. 347.

Three days after the gathering, on September 19, 2001, Kwon and Hasan met Al-Timimi for lunch. They told Al-Timimi that they were traveling to Pakistan to attend the LET camps. Al-Timimi advised the two on how best to evade detection during their trip: "He told us . . . don't take anything suspicious. He told us that if Mahmood [Hasan] was to get stopped for some reason at the airport, that I [Kwon] should also . . . stop my trip, because I won't be able to find my way around Pakistan[.]" J.A. 1165. He also advised them on what to do if they were stopped by the authorities at the airport: "He told us to act scared and ask for our lawyers and . . . our mothers." J.A. 1165–66.

### 3. *Travels Abroad*

Kwon, Hasan, Aatique, and others did in fact travel to Pakistan and to LET training camps. They trained with various weapons at the camps, including rocket-propelled grenades.

At some point, though, LET stopped sending individuals to Afghanistan to fight because of the changing tides of power there. So none of the individuals from Dar al-Arqam who trained with LET ever made it to Afghanistan—or anywhere else—to engage in combat.

### 4. *October Meeting at Al-Timimi's Home*

In early October 2001, Al-Timimi held a gathering at his home, at which a number of attendees who did not attend the September 16 meeting were present, including Surratt and Al-Hamdi. Al-Timimi again conveyed that it was obligatory on all Muslims to help

8

Muslims in Afghanistan and Pakistan. He instructed that attendees should "support[] them physically, [and] if you can't support them physically, support them financially, [and] if you can't support them financially, support them through speaking of them good or telling the good of what they are doing, and if you can't do that, then at least pray for them." J.A. 538–39.

### 5. *Investigations*

Investigations into the individuals connected through Dar al-Arqam ramped up in earnest in February 2003, when search warrants were executed at certain individuals' homes. The investigation involved recorded phone calls; search warrants executed at many individuals' homes, including Al-Timimi's; and numerous interviews.

In June 2003, eleven individuals affiliated with Dar al-Arqam were indicted, including Kwon, Hasan, Khan, Aatique, Royer, Al-Hamdi, Surratt, Hammad Abdur-Raheem, and Caliph Basha Ibn Abdur-Raheem, for various offenses concerning, among other allegations, a conspiracy to engage in military expeditions against the United States.

Investigators interviewed Al-Timimi the same month and again several other times over the next year. He admitted to much of the conduct and conversations that the Government knew about, including that he attended the September 16 meeting and may have told the attendees that jihad was permissible, though he denied encouraging anyone to join LET and said that he had in fact discouraged individuals from going to participate in jihad.[6]

---

[6] At one point, Al-Timimi told investigators he had sent an unidentified person to go and try to discourage Kwon and Hasan from following through on their plans to go to a

B.

In September of 2004, a grand jury in the Eastern District of Virginia returned a six-count indictment, charging Al-Timimi with aiding and abetting, conspiring, and attempting to contribute to terrorist groups. Al-Timimi pled not guilty to all six counts, and several months later the grand jury returned a superseding indictment. This operative indictment contained ten counts:

- **Count 1**: inducing others to conspire to use firearms in violation of 18 U.S.C. §§ 2, 924(o);

- **Count 2**: soliciting others to levy war against the United States in violation of 18 U.S.C. §§ 373, 2381;

- **Count 3**: inducing others to conspire to levy war in violation of 18 U.S.C. §§ 2, 2384;

- **Count 4**: attempting to contribute services to the Taliban in violation of 50 U.S.C. § 1705;

- **Count 5**: inducing others to aid the Taliban in violation of 18 U.S.C. § 2 and 50 U.S.C. § 1705;

- **Count 6**: inducing others to conspire to violate the Neutrality Act in violation of 18 U.S.C. §§ 2, 371;

- **Counts 7–8**: inducing others to use firearms in violation of 18 U.S.C. §§ 2, 924(c); and

- **Counts 9–10**: inducing others to carry rocket-propelled grenades in violation of 18 U.S.C. §§ 2, 844(h).

---

training camp; that person was eventually identified as Yousuf Idris, but the details of this are shaky. Al-Timimi also said he had sent Al-Hamdi to discourage another of the men from going to join LET.

Following a multi-week trial, the jury returned guilty verdicts on all counts. Al-Timimi moved for a judgment of acquittal, raising sufficiency-of-the-evidence and First Amendment issues. The district court denied the motion. In July 2005, the district court sentenced Al-Timimi to life imprisonment on Count 8; 121 months on each of Counts 1–3, to be served concurrently; 120 months on each of Counts 4–5, to be served concurrently; 60 months on Count 6, to be served concurrently; 360 months on Count 7, to be served consecutively; 120 months on Count 9, to be served consecutively; and 240 months on Count 10, to be served consecutively.

This case now reaches us on direct appeal from Al-Timimi's 2005 convictions. In the twenty years that have elapsed since those convictions, the case has taken a multitude of procedural detours. Much of that procedural record is immaterial to this appeal, so we provide only a summary here.

Following sentencing, Al-Timimi filed a timely appeal to this Court. But while that appeal was pending in late 2005, news reports broke of certain government surveillance programs, which caused Al-Timimi to file an uncontested motion to vacate the appeal and remand the case to the district court for discovery of any undisclosed surveillance of communications relevant to his case. This Court granted the motion. Before the district court, Al-Timimi filed several motions in furtherance of his efforts to obtain access to relevant documents. The district court did not issue its final order denying Al-Timimi's motions until May 2014. Al-Timimi again filed a timely appeal to this Court.

But after Al-Timimi uncovered additional relevant documents in the National Archives, he once again sought a limited remand of his appeal, which this Court granted.

Separately, around the same time that Al-Timimi sought this second remand, the United States Supreme Court decided *Johnson v. United States*, 576 U.S. 591 (2015). There, the Supreme Court invalidated part of the definition of "violent felony" in 18 U.S.C. § 924(e) as unconstitutionally vague. *Id.* at 597. Subsequently, in *United States v. Davis*, 588 U.S. 445, 451–52 (2019), the Court followed its holding in *Johnson* to strike down a similar definition of "crime of violence" in 18 U.S.C. § 924(c)(3)(B). Because Al-Timimi's convictions for Counts 1, 7, and 8 rested on this language in § 924(c), he moved for this Court to expand the scope of the remand to allow the district court to consider motions related to those convictions. This Court granted the motion to expand the scope of the remand in July 2016. Finding that *Johnson* and *Davis* undermined the validity of Al-Timimi's convictions on Counts 1, 7, and 8, the district court vacated those convictions in July 2024. *United States v. Al-Timimi*, 741 F. Supp. 3d 365, 385 (E.D. Va. 2024).

Meanwhile, in 2020, Al-Timimi sought release to home confinement due to the COVID-19 pandemic. The district court granted his release in September 2020, and this Court affirmed. *United States v. Al-Timimi*, No. 1:04-cr-385, 2020 WL 4810120, at *1 (E.D. Va. Aug. 18, 2020), *aff'd*, No. 20-4441, 2020 WL 8618188 (4th Cir. Aug. 31, 2020).

At present, Al-Timimi has fully served his concurrent sentences on Counts 2–6 and is serving the remainder of his consecutive sentences for Counts 9 and 10 under home confinement.

## C.

Following the resolution of all issues before the district court on remand, Al-Timimi now appeals his convictions for Counts 2–6, 9, and 10.

Al-Timimi raises First Amendment challenges to all counts. Specifically, Al-Timimi argues that his speech that formed the basis for the charges against him did not constitute incitement to imminent lawless action, nor did it amount to facilitation or solicitation of unlawful conduct, and therefore that it retained protection under the First Amendment.

Al-Timimi also argues that each count of conviction rests on insufficient evidence, that several of the charges against him rested on legally unsound premises, and that the jury was erroneously instructed on several points of law.

## II.

Of the many challenges to Al-Timimi's convictions, we need only address one: whether the comments he made that formed the basis for all the charges were protected by the First Amendment. Because we conclude that they were so protected, we do not reach his remaining challenges.

## A.

Whether speech falls into a category unprotected by the First Amendment "is a question of law and fact that we review de novo." *United States v. Bly*, 510 F.3d 453, 457 (4th Cir. 2007) (citing *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 506–11 (1984)). Appellate courts ordinarily apply a deferential standard of review to lower-court findings of fact, *Jackson v. Virginia*, 443 U.S. 307, 319 (1979), reflecting our respect for the "unique opportunity" afforded to the trial court finder of fact "to evaluate the credibility of witnesses and to weigh the evidence," *Inwood Lab'ys, Inc. v. Ives Lab'ys, Inc.*, 456 U.S. 844, 855 (1982). But the Supreme Court has recognized that "the presumption of

13

correctness that attaches to factual findings [in the lower court] is stronger in some cases than in others." *Bose Corp.*, 466 U.S. at 500.

Particularly, in cases where a defendant challenges their conviction on First Amendment grounds, we must "review the evidence to make certain that [First Amendment] principles have been constitutionally applied." *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 285 (1964). Due to the profound constitutional significance of this inquiry, we "cannot avoid making an independent constitutional judgment on the facts of the case." *Bose Corp.*, 466 U.S. at 508 n.27 (quoting *Jacobellis v. Ohio*, 378 U.S. 184, 190 (1964) (opinion of Brennan, J.)).

"Because the limits of an unprotected category" of speech "must be determined by the judicial evaluation of special facts that have been deemed to have constitutional significance," we "must conduct an independent examination of the allegedly unprotected material." *United States v. Bartow*, 997 F.3d 203, 208 (4th Cir. 2021) (quoting *Bose Corp.*, 466 U.S. at 505, 507–08) (cleaned up). We thereby ensure that "the judgment does not constitute a forbidden intrusion on the field of free expression." *Bose Corp.*, 466 U.S. at 499 (quoting *N.Y. Times Co.*, 376 U.S. at 285).

## B.

Plenty of speech encouraging criminal activity is protected under the First Amendment. Abstract "advocacy of lawlessness" is protected speech. *United States v. Miselis*, 972 F.3d 518, 533 (4th Cir. 2020). "[M]ere encouragement" of unlawful activity "is quintessential protected advocacy." *Id.* at 536; *see also United States v. Williams*, 553 U.S. 285, 299–300 (2008). The "teaching of the moral propriety or even moral necessity

14

for a resort to force and violence" retains First Amendment protection. *Noto v. United States*, 367 U.S. 290, 297–98 (1961).

But such speech loses First Amendment protection when it bears certain additional characteristics: Speech advocating lawlessness or the use of force is unprotected when it is "directed to inciting or producing *imminent* lawless action and is likely to incite or produce such action." *Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969) (emphasis added). In this context, the Supreme Court has distinguished between "mere abstract teaching" of the "moral propriety" or "necessity" of violence, on the one hand, and "preparing a group for violent action and steeling it to such action," on the other. *Id.* at 448 (quoting *Noto*, 367 U.S. at 297–98). The state may criminalize speech that is aimed at accomplishing the latter without running afoul of the First Amendment.

A separate category of unprotected speech is that which facilitates or solicits a particular crime. "Facilitation—also called aiding and abetting—is the provision of assistance to a wrongdoer with the intent to further an offense's commission." *United States v. Hansen*, 599 U.S. 762, 771 (2023). Speech constituting facilitation may be proscribed without offending the First Amendment because liability in such cases is not premised on mere advocacy of crime; rather, it relies on defendants' "successful efforts to assist others by detailing to them the *means* of accomplishing the crimes." *Rice v. Paladin Enters., Inc.*, 128 F.3d 233, 246 (4th Cir. 1997) (emphasis added) (quoting U.S. Dep't of Justice, *Report on the Availability of Bombmaking Information, the Extent to Which Its Dissemination is Controlled by Federal Law, and the Extent to Which Such Dissemination May Be Subject*

*to Regulation Consistent with the First Amendment to the United States Constitution* 37

(April 1997) [hereinafter *DOJ Report on the Availability of Bombmaking Information*]).

Solicitation is "the intentional encouragement of an unlawful act." *Hansen*, 599 U.S.

at 771. Such speech "intended to induce or commence illegal activities" enjoys no First

Amendment protection. *Williams*, 553 U.S. at 298. The Supreme Court has long recognized

that speech constituting "an integral part of conduct in violation of a valid criminal statute"

is unprotected because of its nature as inseparably bound up with the criminal act. *Giboney*

*v. Empire Storage & Ice Co.*, 336 U.S. 490, 498 (1949).

Neither facilitation nor solicitation requires the provision of physical assistance

completing the crime; "for both, words may be enough." *Hansen*, 599 U.S. at 771. But,

crucially, "both require an intent to bring about a *particular* unlawful act." *Id.* (emphasis

added).

A single instance of speech could certainly raise questions as to whether it is

unprotected due to imminence under *Brandenburg*, *and* whether it constitutes criminal

solicitation or facilitation. *See, e.g.*, *Miselis*, 972 F.3d at 537–38 (providing that speech

tending to organize a riot implicates *Brandenburg*'s imminence requirement and could also

be characterized as unprotected aiding and abetting). But imminence is not necessary for

speech to constitute unprotected solicitation or facilitation: "The question of whether

criminal conduct is 'imminent' is relevant for constitutional purposes only where, as in

*Brandenburg* itself, the government attempts to restrict advocacy, as such." *Rice*, 128 F.3d

at 246 (quoting *DOJ Report on the Availability of Bombmaking Information* at 37) (cleaned

up). Where a defendant uses speech to assist another in furthering the commission of a

particular criminal offense, or to intentionally encourage commission of a specific crime, the government need not prove that the defendant is advocating imminent lawless action to establish criminal liability. *See id.* (noting that *Brandenburg*'s "imminence" requirement "generally poses little obstacle to the punishment of speech that constitutes criminal aiding and abetting" because criminal liability in such cases rests on different grounds).

We now address whether Al-Timini's speech fell within any of several limited categories of expression unprotected by the First Amendment—namely, incitement of imminent lawless action; criminal solicitation; or facilitation through aiding and abetting.

C.

Did Al-Timimi's speech constitute incitement of imminent lawless action? We answer, no.

1.

Our Supreme Court in *Brandenburg* required that speech be both intended to produce imminent lawless action and likely to produce such action to lose First Amendment protection. *Brandenburg*, 395 U.S. at 447; *Counterman v. Colorado*, 600 U.S. 66, 76 (2023) ("[T]he First Amendment precludes punishment . . . unless the speaker's words were 'intended' (not just likely) to produce imminent disorder.").

Additionally, "timing is crucial" under *Brandenburg. McCoy v. Stewart*, 282 F.3d 626, 631 (9th Cir. 2002); *see also Herceg v. Hustler Mag., Inc.*, 814 F.2d 1017, 1022 (5th Cir. 1987) ("The crucial element to lowering the [F]irst [A]mendment shield is the imminence of the threatened evil."). To put it plainly: The advocated-for lawless action must be happening quite soon. *See Imminent*, Oxford English Dictionary Online,

17

https://www.oed.com/dictionary/imminent_adj [https://perma.cc/7ST8-5JAQ] (last visited Jan. 7, 2026) (definition including "close at hand in its incidence" and "coming on shortly").

There is no formula for determining how far in the future the contemplated action can occur before it ceases to be "imminent." One of our fellow circuit courts, the Third Circuit, concluded that a gap of three weeks between the allegedly inciting speech and the ultimate lawless action was too long to satisfy *Brandenburg*'s imminence requirement. *United States v. Fullmer*, 584 F.3d 132, 155 n.10 (3d Cir. 2009). And the Eleventh Circuit has found that speech did not constitute unprotected incitement in part because it did not direct anyone to take unlawful action "immediately or in the near future." *Bailey v. Iles*, 87 F.4th 275, 284 (5th Cir. 2023).

In determining what length of time exceeds the bounds of what is "imminent," we find instructive Justice Holmes's dissent in *Abrams v. United States*, 250 U.S. 616 (1919), which has been recognized as an important step along the Supreme Court's path to drawing a line between punishable exhortation to commit crime and "protected condemnation of a law." *See, e.g.*, Eugene Volokh, *The "Speech Integral to Conduct" Exception*, 101 Cornell L. Rev. 981, 991 (2016). There, Justice Holmes cautioned that we must be "eternally vigilant against attempts to check the expression of opinions that we loathe and believe to be fraught with death, unless they so imminently threaten immediate interference with the lawful and pressing purposes of the law that an immediate check is required." *Abrams*, 250 U.S. at 630 (Holmes, J., dissenting). "Only the emergency that makes it immediately dangerous to leave the correction of evil counsels to time," he continued, "warrants making

18

any exception to the sweeping command, 'Congress shall make no law . . . abridging the freedom of speech.'" *Id.* at 630–31 (quoting U.S. Const. amend. I).

This framing provides a cogent justification for the lack of First Amendment protection for speech inciting imminent lawlessness: When there is no time to correct the evils of the inciting speech before the lawlessness occurs, the only way to curb those evils is to proscribe that speech in advance.

Next, in addition to being sufficiently imminent, the contemplated action must also be sufficiently definite: "advocacy of illegal action at some *indefinite* future time" is not enough to satisfy *Brandenburg*. *Hess v. Indiana*, 414 U.S. 105, 108 (1973) (per curiam) (emphasis added). Instead, the speech must advocate lawlessness with sufficient "particularity" to "prevail under the *Brandenburg* standard." *Higgins v. Ky. Sports Radio, LLC*, 951 F.3d 728, 737 (6th Cir. 2020) (citing *Hess*, 414 U.S. at 108). When a speaker advocates crime "without any recommendation as to how or when" to carry out the act, the speech will generally lack the requisite specificity to satisfy *Brandenburg*. *McCoy*, 282 F.3d at 632. As the *Brandenburg* Court itself instructed, the "mere *abstract* teaching" of the necessity of violence is protected. *Brandenburg*, 395 U.S. 448 (emphasis added) (quoting *Noto*, 367 U.S. at 297); *see also Rice*, 128 F.3d at 263–64 (explaining that the abstractness of the speech is essential to its protected status per *Brandenburg*).

Putting this all together, incitement under *Brandenburg* requires speech that is intended and likely to produce lawless action, quite soon, and in a definite (rather than abstract) way.

2.

Turning to the facts of the case before us: Al-Timimi's speech urged criminal activity that was neither sufficiently imminent nor sufficiently definite to lose First Amendment protection under *Brandenburg*. He encouraged those gathered at Kwon's home on September 16 to "leave the United States," "[j]oin the mujahideen" to "fight the Indians or the Russians or the Americans," and "defend Afghanistan." J.A. 1147–48. He advised them to go to Pakistan, "join the LET and get some training from the LET camps." J.A. 1153. He said they should "go through Royer" to connect with LET. J.A. 1155.

But Al-Timimi specified no time frame in which these actions should be completed and no details as to how they should be carried out. He did not suggest where in Pakistan the men should go, or which LET camp they should attend. He urged the men broadly to engage in jihad against any of three different nations—India, Russia, or the United States. He said they should "defend" Afghanistan because they had a religious obligation to do so. J.A. 1148. Because these exhortations were vague and general, they fall short of advocating the imminent lawlessness contemplated by *Brandenburg*.

Examples of federal circuit courts affirming criminal convictions for speech inciting imminent lawlessness under *Brandenburg* are few. But one such case bears examination because it illustrates how the evidence against Al-Timimi does not demonstrate imminence.

In *United States v. Fullmer*, the Third Circuit affirmed convictions of an organization called Stop Huntingdon Animal Cruelty ("SHAC")—whose mission was to shut down the animal-testing operations of a corporation called Huntingdon Life Sciences—and affiliated individuals for conspiracy to violate the Animal Enterprise

20

Protection Act, conspiracy to commit stalking, and stalking. 584 F.3d at 137. The evidence against the defendants there was comprised largely of speech in the form of posts made to SHAC's website. *See id.* at 138–42. The court was careful to emphasize that much of the speech on the website retained First Amendment protection: Coordinating demonstrations at the homes of Huntingdon employees was not unlawful. *Id.* at 155. Posting a list of "Top Twenty Terror Tactics," which favorably discussed illegal conduct but contained no suggestion of any plan to imminently implement the tactics, was not unlawful. *Id.*

But, the court explained, posts on the SHAC website urging unlawful electronic civil disobedience and providing "links to the tools necessary to carry out" the unlawful acts crossed the line into unprotected speech. *Id.* SHAC emailed supporters to urge them "to participate in electronic civil disobedience at a specified time." *Id.* SHAC posted updates on how the electronic activities were going as they occurred, noting the ways in which they were having their desired effect of disrupting Huntingdon's activities. *Id.* These words "encouraged and compelled an imminent, unlawful act that was not only likely to occur, but provided the schedule by which the unlawful act was to occur." *Id.* Therefore, this speech was unprotected under *Brandenburg*. *Id.*

Critical features of the *Fullmer* defendants' speech are absent from Al-Timimi's speech. Whereas the *Fullmer* defendants identified a specific unlawful act that would take place at a specific time, encouraged readers to participate, and provided the means by which to carry out the unlawful act, Al-Timimi gave only encouragement to engage in a general kind of criminal act at some point in the near future.

His words did not create the "emergency that makes it immediately dangerous to leave the correction of evil counsels to time." *Abrams*, 250 U.S. at 630 (Holmes, J., dissenting). Whatever lawlessness Al-Timimi urged, it was neither imminent nor definite, and his speech therefore was not unprotected under *Brandenburg*.

### D.

Did Al-Timimi's speech constitute unprotected solicitation or aiding and abetting of a crime? We answer, no.

### 1.

Speech "integral to criminal conduct" is not protected under the First Amendment. *United States v. Stevens*, 559 U.S. 460, 468 (2010) (citing *Giboney*, 336 U.S. at 498). Criminal solicitation and aiding and abetting are two categories of such speech. *See Williams*, 553 U.S. at 298 (criminal solicitation); *United States v. White*, 610 F.3d 956, 960 (7th Cir. 2010) (same); *United States v. Freeman*, 761 F.2d 549, 552 (9th Cir. 1985) (same); *cf. United States v. Barnett*, 667 F.2d 835, 842 (9th Cir. 1982) (noting that aiding and abetting "frequently involve[s] the use of speech as part of the criminal transaction").

Criminal solicitation is "the intentional encouragement of an unlawful act." *Hansen*, 599 U.S. at 771. The crime of solicitation "is complete as soon as the encouragement occurs," regardless of what happens next. *Id.* And the speaker must intend "to bring about a particular unlawful act." *Id.* Facilitation, or aiding and abetting, "is the provision of assistance to a wrongdoer with the intent to further an offense's commission." *Id.* Unlike solicitation, there is no criminal liability for aiding and abetting unless the wrongful act is

actually carried out. *Id.* But like solicitation, culpability for facilitation also requires an intent to bring about a specific crime. *Id.*

Before proceeding any further in this analysis, we pause to clarify a few points of law. The line between, on the one hand, solicitation or aiding and abetting of crime, and, on the other hand, incitement of imminent lawlessness under the *Brandenburg* framework, has not always been described with precision in the case law.

For example, some state courts have fully collapsed the categories of incitement and criminal solicitation or facilitation into one. *See, e.g.*, *People v. Rubin*, 158 Cal. Rptr. 488, 491–92 (Cal. Ct. App. 1979); *State v. Ferguson*, 264 P.3d 575, 578 (Wash. Ct. App. 2011).

And while not fully collapsing the categories, this Court, too, has in the past blurred the lines in describing incitement and criminal solicitation or facilitation. In *United States v. Fleschner*, this Court affirmed the denial of defendants' request for a jury instruction outlining a potential First Amendment defense to charges of conspiring to obstruct the IRS's efforts to collect income taxes. 98 F.3d 155, 158 (4th Cir. 1996). The defendants had advised multiple individuals to complete tax forms so as to unlawfully avoid paying income tax. *Id.* at 157. The Court, citing *Brandenburg*, concluded that "[a] First Amendment defense is warranted if there is evidence that the speaker's purpose or words are mere abstract teaching of the moral propriety of opposition to the income tax law." *Id.* at 158. Because "[t]he defendants' words and acts were not remote from the commission of the criminal acts," the Court determined that no reasonable jury could have found in their favor on a First Amendment theory. *Id.* at 158–59.

But while the Court assessed the First Amendment issue through a *Brandenburg* lens, it used the language of solicitation and facilitation to describe the unlawful acts: "The evidence show[ed] that the attendees followed the instruction and advice of the defendants" and "that the attendees' unlawful actions were *solicited* by the defendants." *Id.* at 159 (emphasis added). "The evidence disclose[d] that a purpose of the meetings was to *encourage* people to unlawful actions by convincing them that it was legal to claim false exemptions, to hide income, and to refuse to file income tax returns or pay income tax." *Id.* (emphasis added); *see also Hansen*, 599 U.S. at 771–72 (explaining that "encourage" is one of the most commonly used verbs "to denote solicitation and facilitation" in a criminal-law context).

The *Fleschner* Court cited favorably another tax-related decision of this Court that similarly conflates *Brandenburg* incitement and speech soliciting or facilitating crime. In *United States v. Kelley*, this Court reviewed the convictions of a defendant for "conspiring to defraud the federal government" and "aiding and assisting in the preparation of false W–4 forms." 769 F.2d 215, 216 (4th Cir. 1985). In *Kelley*, the Court rejected a First Amendment defense because the defendant "told the listeners what to do and how to prepare the [fraudulent tax] forms" and "actually supplied forms and materials to be filed with W–4 forms." *Id.* at 217. In other words, the defendant facilitated others' tax crimes. Once again, the Court imported *Brandenburg*'s framework into its analysis of facilitation, explaining that "[t]he cloak of the First Amendment envelops critical, but abstract, discussions of existing laws, but lends no protection to speech which urges the listeners to commit violations of current law." *Id.* (citing *Brandenburg*, 395 U.S. 444).

24

But in the decades since this Court decided *Fleschner* (in 1996) and *Kelley* (in 1985), the Supreme Court has begun to more clearly delineate the various categories of unprotected speech. Most notably, in *Stevens*, the Court described "incitement" (citing *Brandenburg*) and "speech integral to criminal conduct" (that is, solicitation and facilitation) as separate categories of unprotected speech. *See Stevens*, 559 U.S. at 468. Perhaps anticipating this shift, this Court also began to draw a clearer distinction between the two categories in cases following *Fleschner* and *Kelley*. *See Rice*, 128 F.3d at 246 (providing that *Brandenburg*'s imminence requirement "generally poses little obstacle to the punishment of speech that constitutes criminal aiding and abetting" because *Brandenburg* applies only when the government punishes advocacy as such), 265 (explaining that the *Brandenburg* "imminence" and "likelihood" requirements do not apply to "speech other than advocacy," such as "instruction in the methods of terror or other crime").

The question, then, is what from *Kelley* and *Fleschner* survives this evolution in Supreme Court precedent outlining distinct unprotected categories of speech?

First, we are compelled to conclude that the *Kelley* Court's statement that the First Amendment does not protect "speech which urges the listeners to commit violations of current law" must now be understood to mean that the First Amendment does not protect speech that, like Kelley's, concretely and intentionally advises listeners as to how to violate the law, urges them to do so, and provides the tools necessary to carry out the violation. *Kelley*, 769 F.2d at 217. The Court explained that Kelley "solicited dues paying members" of a group formed on the idea that federal income tax was unconstitutional as applied to

wages; he then "explained how the members might avoid all income tax withholding on their wages and obtain refunds of previously withheld wages," "provided forms for use by the members and gave them detailed instructions as to how they should be filled out," and "instructed the members to destroy their credit cards and to deal only in cash so that they would leave no paper trails to be followed by the IRS agents." *Id.* at 216. Supreme Court precedent is clear that the mere encouragement of unlawful activity is protected speech, *see Williams*, 553 U.S. at 299–300, and we do not read *Kelley* to suggest otherwise: Kelley clearly did more than merely advocate in favor of lawlessness.

Second, we must now understand the references to the *Brandenburg* framework in *Kelley* and *Fleschner* to be a recognition of the need for speech to contain more than mere exhortations to violate the law for that speech to lose First Amendment protection. Whether speech is framed as inciting imminent lawlessness under *Brandenburg* or constituting criminal solicitation or facilitation, that speech must do more than simply urge unlawful conduct. But we reiterate today what we have stated before: "The question of whether criminal conduct is 'imminent' is relevant for constitutional purposes only where, as in *Brandenburg* itself, the government attempts to restrict advocacy, as such." *Rice*, 128 F.3d at 246 (quoting *DOJ Report on the Availability of Bombmaking Information* at 37) (cleaned up). Speech need not solicit or facilitate *imminent* lawlessness to constitute unprotected solicitation or aiding and abetting. Still, the speaker must intend "to bring about a *particular* unlawful act." *Hansen*, 599 U.S. at 771 (emphasis added).

So, to prove criminal solicitation, the government must prove the intentional encouragement of a particular unlawful act and the requisite intent to bring about the

unlawful act. *Id.* To prove aiding and abetting, the government must prove "the provision of assistance to a wrongdoer," the intent to bring about a particular unlawful act, and the actual commission of the offense. *Id.* And from what survives of this Court's precedent in *Fleschner* and *Kelley*, we take the lesson that although speech need not satisfy *Brandenberg*'s "imminence" standard to constitute unprotected solicitation or facilitation, it still must, like *Brandenburg* incitement, consist of more than mere advocacy or encouragement of lawlessness.

### 2.

With those clarifying points settled, we turn to the charges against Al-Timimi.

Five of the remaining charges against Al-Timimi were pursued as aiding-and-abetting offenses: Count 3, counseling and inducing others to conspire to levy war in violation of 18 U.S.C. §§ 2 and 2384; Count 5, counseling and inducing others to attempt to aid the Taliban in violation of 18 U.S.C. § 2 and 50 U.S.C. § 1705; Count 6, counseling and inducing others to conspire to violate the Neutrality Act in violation of 18 U.S.C. §§ 2, 371; and Counts 9 and 10, which both charged inducing others to carry rocket-propelled grenades in violation of 18 U.S.C. §§ 2, 844(h).[7]

To aid and abet a crime is to provide "assistance to a wrongdoer with the intent to further an offense's commission." *Hansen*, 599 U.S. at 771. Culpability under an aiding-and-abetting theory is thus "premised, not on defendants' advocacy of criminal conduct,

---

[7] Each of these counts listed both the substantive offense Al-Timimi was accused of facilitating as well as 18 U.S.C. § 2, which provides that "[w]hoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal."

but on defendants' successful efforts to assist others by detailing to them the means of accomplishing the crimes." *Rice*, 128 F.3d at 246 (cleaned up). "A defendant is guilty of aiding and abetting if he has 'knowingly associated himself with and participated in the criminal venture.'" *United States v. Burgos*, 94 F.3d 849, 873 (4th Cir. 1996) (quoting *United States v. Winstead*, 708 F.2d 925, 927 (4th Cir. 1983)).

Al-Timimi did not help anyone to commit crimes. To be sure, he encouraged them. But the most that he did to further the commission of these crimes was to advise individuals—in quite general terms—on how to react to the September 11 attacks: Leave the United States, "[j]oin the mujahideen," and fight India or Russia or the United States. J.A. 1147. "[J]oin the LET and get some training from the LET camps" by "go[ing] through Royer." J.A. 1153, 1155. Or, in lieu of fighting, at least "leave America" and go to "live with the good Muslims" in another country. J.A. 341. A few days after those initial conversations, he gave general advice to Kwon and Hasan on evading detection while traveling: "don't take anything suspicious"; act scared and ask for a lawyer if stopped. J.A. 1165. Nor did Al-Timimi facilitate the formation of any alleged conspiracy.[8]

The common thread in aiding-and-abetting cases—indeed, a necessary component for criminal culpability—is participation. *See Burgos*, 94 F.3d at 873 (government must establish that defendant "participated" in principal's criminal intent; "participation at some

---

[8] In his Opening Brief, Al-Timimi challenges his being charged with aiding and abetting conspiracies, arguing, among other things, that there were legal flaws in the Government's theories to support liability. Because we reach only Al-Timimi's First Amendment arguments, we assume without deciding that the Government's aiding-and-abetting-a-conspiracy theory was valid.

stage accompanied by knowledge of the result and intent to bring about that result" (cleaned up)). And although participation can be comprised of speech alone, Al-Timimi's speech was not participation but was merely encouragement.

Count 2—the only solicitation crime—charged Al-Timimi with soliciting others to commit a crime of violence: namely, treason, by levying war against the United States, in violation of 18 U.S.C. §§ 373 and 2381.[9] This charge fails for much the same reason as the aiding-and-abetting charges: While Al-Timimi certainly encouraged unlawful acts generally, the evidence did not demonstrate that he encouraged, with the requisite intent, a *specific* unlawful act. *See Hansen*, 599 U.S. at 771.

The Government argues that Al-Timimi's case is materially indistinguishable from *United States v. Rahman*, in which the Second Circuit held that a cleric's speech soliciting certain unlawful acts was unprotected by the First Amendment. 189 F.3d 88, 117 (2d Cir. 1999) (per curiam). Of course, we are not bound by the Second Circuit's interpretation in that case. But regardless, Rahman's speech, unlike Al-Timimi's, directly solicited specific criminal acts to occur in a specific time frame: He told another to "turn[] his rifle's barrel

---

[9] The indictment charges that, "[b]etween on or about September 16, 2001, and continuing up to on or about October 21, 2001," Al-Timimi, "with intent that another person engage in conduct constituting a felony that has as an element the use, attempted use or threatened use of physical force against property or the person of another in violation of the laws of the United States, and under circumstances strongly corroborative of that intent, did knowingly and unlawfully solicit, command, induce, and otherwise endeavor to persuade Masoud Khan, Yong Kwon, Khwaja Hasan, Muhammed Aatique, Randall Royer, Hammad Abdur-Raheem, Donald Surratt, Unindicted Conspirator #2, Caliph Basha Ibn Abdur-Raheem and others . . . to levy war against the United States and adhere to their enemies, while owing allegiance to the United States, giving aid and comfort to the Taliban in the United States and Afghanistan and elsewhere." J.A. 73.

to [Egyptian] President [Hosni] Mubarak's chest, and kill[] him" during a planned 1993 visit by Mubarak to the United States. *Id.*; *see id.* at 108. The specificity and concreteness that characterized Rahman's speech is absent from Al-Timimi's.

III.

The First Amendment's protection does not depend on the popularity or palatability of the message conveyed. On the contrary, it is most vital when speech offends, disturbs, or challenges prevailing sensibilities. In other words, the First Amendment stands as a structural safeguard of our democratic order.

For that reason, the First Amendment shields "loathsome and unpopular speech" as fully as it does "speech that is celebrated and widely accepted," allowing "all manner of speech to enter the marketplace of ideas." *Bible Believers v. Wayne County*, 805 F.3d 228, 243 (6th Cir. 2015). Otherwise, "if it only served to safeguard the majority views," then "[t]he protection would be unnecessary." *Id.*

We as judges are thus duty-bound to rigorously police the boundaries of the First Amendment's protections. That duty demands an independent and searching examination of the record to ensure that Al-Timimi's convictions did not "constitute a forbidden intrusion on the field of free expression." *Bose Corp.*, 466 U.S. at 499 (quoting *N.Y. Times Co.*, 376 U.S. at 285). Anything less would erode not only individual liberties but also public confidence in the neutrality and legitimacy of our courts.

In this case, Al-Timimi's remaining convictions rest not on criminal conduct carried out through speech, but on the substance of—and perceived threat posed by—the mere ideas expressed. To permit those convictions to stand would be to endorse a system in

30

which speech may be punished simply because it alarms, offends, or challenges prevailing norms. That result would undermine the rule of law by allowing constitutional protections to fluctuate with political and social pressures.

Our Constitution does not tolerate such a result.

Accordingly, we vacate Al-Timimi's convictions for all remaining charges—Counts 2, 3, 4, 5, 6, 9, and 10 of the Superseding Indictment—and remand to the district court for entry of judgments of acquittal.

*VACATED AND REMANDED*